1

2

3 **IN THE UNITED STATES DISTRICT COURT**

4 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6 JOSE T. BENITEZ,                                    CASE NO.  1:05-cv-00967 TAG

7            Plaintiff,                                    MEMORANDUM DECISION AND ORDER
                                                            ON PLAINTIFF'S APPEAL FROM
8        vs.                                                ADMINISTRATIVE DECISION

9 JO ANNE B. BARNHART,                                ORDER REMANDING CASE PURSUANT
   Commissioner of Social Security,                   TO SENTENCE FOUR OF 42 U.S.C. § 405(g)
10
           Defendant.                                 ORDER DIRECTING THE CLERK TO
11                                                     ENTER JUDGMENT IN FAVOR OF
                                                       PLAINTIFF AND AGAINST DEFENDANT
12 _____/

13        Plaintiff Jose T. Benitez ("claimant" or "plaintiff") seeks judicial review of an administrative

14 decision denying his claims for disability insurance benefits under Title II of the Social Security Act

15 ("the Act"), 42 U.S.C. § 401 et seq., and for supplemental security income under Title XVI of the

16 Act, 42 U.S.C. § 1381 et seq.  Pending before the Court is claimant's appeal from the administrative

17 decision of the Commissioner of Social Security ("Commissioner").  Claimant filed his complaint on

18 July 21, 2005 (Doc. 1), and his opening brief on March 16, 2006.  (Doc. 17).  The Commissioner

19 filed her opposition on May 18, 2006 (Doc. 21). Claimant's reply brief was filed on June 1, 2006.

20 (Doc. 22).

21        Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed

22 before a United States Magistrate Judge.  (Docs. 4 and 13).  By an order dated March 24, 2006, this

23 action was assigned to the United States Magistrate Judge for all further proceedings.  (Doc. 18).

24                                      **JURISDICTION**

25        On June 26, 2006, claimant protectively filed[1] an application for Title XVI benefits, alleging

26

27        [1]  To qualify as an effective supplemental security income claim under Title XVI, an application for benefits
   must be submitted on a prescribed form.  20 C.F.R. § 416.305.  However, a written statement indicating a person's intent
28 to claim benefits can, if certain coincident and subsequent requirements are met, establish a protective filing date.  20

1

1  a disability onset date, due to back-related disorders, of August 17, 2001.  (Administrative Record

2  ("AR") 308-09.)   On July 10, 2002, claimant also applied for Title II benefits.  (AR 88-90.)

3  Claimant's applications were denied on September 26, 2002 (AR 50, 308), and there is no evidence

4  in the administrative record that claimant sought further administrative review.  About six months

5  later, on March 14, 2003, claimant again filed protective applications for Title II and Title XVI

6  benefits (AR 62, 314).  These were followed by formal benefits applications filed by claimant on

7  March 27, 2003.  (AR 91-93, 310-12.)  Once again, a disability onset date of August 17, 2001 was

8  alleged.  (AR 91, 310.)  Claimant's renewed applications were denied initially (AR 74-77, 313-14)

9  and on reconsideration (AR 79-92, 315).  After a hearing on December 13, 2004, Administrative

10  Law Judge ("ALJ") James P. Berry found that claimant was not disabled in a written determination

11  dated January 18, 2005.  (AR 15-23, 30-49.)  The Appeals Council denied review on May 26, 2005

12  (AR 7-9), leaving the ALJ's decision of January 18, 2005, as the final decision of the Commissioner.

13  On July 21, 2005, within sixty days of the Appeals Council decision, claimant timely appealed to the

14  district court pursuant to 42 U.S.C. § 405(g).  (Doc. 1.)

15  <center>**STATEMENT OF FACTS**</center>

16  **1.    Claimant's Testimony**

17  Claimant was 59 years old at the time of the administrative hearing before ALJ Berry.  (AR

18  33-346.)  Claimant testified, through an interpreter, that he had a third grade education in Mexico

19  and that he was unable to read or write in English.  (AR 33-34.)  During the last 15 years, according

20  to claimant, his job had been picking fruit, from California up to Washington State.  (AR 34.)

21  Claimant testified that he last did this work when he fell from a ladder on August 17, 2001, and has

22  not worked since that fall.  (AR 34-36.)

23  As to his medical condition, claimant testified that his fall from a ladder had caused ongoing

24  pain in his lower back, shoulder, neck and sometimes his left knee.  (AR 35.)  According to claimant,

25  his condition limits his sitting to 15 to 30 minutes at a time, although he could sit longer in a

26  reclining position.  (AR 36-37.)  Claimant also testified that he could only stand for 10 to 30 minutes

27

28  C.F.R. § 416.340.

<center>2</center>

at a time, and perhaps 4 hours in an 8-hour workday when alternating between sitting and standing. (AR 37).  Claimant further testified that he could only walk about a block at a time, could only lift 10 to 15 pounds "once" (i.e., not frequently), that he could not reach above chest level due to his left shoulder pain, and that he had difficulty grasping objects with his left hand.  (AR 37-42).

As to his daily life and activities, claimant testified that he watches television, goes outside, walks a little and sometimes goes shopping with his girlfriend.  (AR 39).  He testified that he also drives a vehicle at times, but with a cushion on the seat.  (AR 38).  Finally, claimant stated that his girlfriend helps him to put on his shoes and socks because he can only move forward a little bit when trying to bend at the waist.  (Id.)

**2.      Medical Reports**

The administrative record contains an August 17, 2001 report by Lila M. Stageberg, M.D., which reflects that on that date claimant fell about seven feet from a ladder, onto his left side and shoulder, while he was at work picking pears.  (AR 149, 153).  Claimant reported pain mainly in his left shoulder, left hip and lower back.  (AR 153).  X-rays were obtained of claimant's C-spine, left shoulder, left hand, left hip and LS-spine.  (AR 152).  A report dated August 24, 2001 noted that these showed degenerative changes in the LS-spine, with no sign of fracture.  (Id.)  In addition, claimant's left hip "appear[ed] fairly normal" and his left shoulder showed no fracture, but with a possibility of a slight AC separation.  (Id.)  The C7 vertebra was suspicious for possible fracture. (Id.)  Otherwise, upon examination, it was noted that claimant showed good range of motion in his spine, with no tenderness of the spinous processes of the lumbosacral spine and only minimal tenderness of the left lumbosacral musculature.  (Id.)  Likewise, claimant's left shoulder was found to be mildly tender, he had a full range of motion with his left hip and his gait was normal.  (Id.)  On October 15, 2001, Dr. Stageberg issued a supplemental medical report stating that other than one visit in which claimant report continued left shoulder pain on September 12, 2001, he had not returned to the clinic.  (AR 149).

Claimant next treated in the Family Health Care Network (AR 155-80).  An x-ray taken September 26, 2001 showed no evidence of fracture or subluxation of the cervical spine, but mild to moderate degenerative changes, possible early degenerative disc disease at C-5/6, C-6/7 and C-7/T-1,

normal positioning of the spinous processes and normal pre-cervical soft tissue regions.  (AR 180).

An x-ray of the left shoulder was unremarkable (id.) and an x-ray of the left knee showed early

degenerative changes but was otherwise unremarkable.  (Id.).  Upon examination by Liberty Lomeli,

PAC on the same date, the impressions were normal range of motion with the left shoulder but with

severe pain, full range of motion of the left knee, negative valgus and varus, but with severe pain on

movement, and pain on movement in the C-spine area.  (AR 178).  Claimant returned for a follow-up

visit on October 3, 2001, whereupon Christopher Gillespie, M.D. noted left shoulder pain and early

degenerative changes in the joints.  (AR 177).  He prescribed physical therapy and Naprosyn.  (Id.).

Claimant returned to the clinic on December 21, 2001 to request a referral for physical therapy,

which was prescribed by Dr. Gillespie.  (AR 170).  Thereafter, a physical therapy report by Don

Uttenreither, P.T. dated January 18, 2002 noted that claimant had completed six sessions and that his

progress was "variable."  (AR 161).  Therapist Uttenreither noted "inconsistencies," "active holding

back" and reported that while claimant's lumbar pain had seemed to be resolving during his

treatment, he nevertheless exhibited severe dysfunction at his last visit.  (Id.)  Therapist Uttenreither

also noted that claimant "move[d] more freely & with minimal restrictions when not being tested"

and further that he "continually brought up issues about his disability and the shortcomings of our

state's payments."  (Id.).

On January 25, 2002, claimant visited with Dr. Gillespie to ask for a letter to the State of

Washington stating that claimant was on disability from November 2001 until his discharge from

physical therapy in January, 2002.  (AR 159).  Dr. Gillespie wrote in a report that he felt it was "okay

for [claimant] to go back to work."  (Id.).  Dr. Gillespie also noted the therapist's concern that

claimant was "lingering as he was resisting various range of motion exercises, but then they observed

him walking out to his car and he was moving with ease in all of his joints without any difficulty."

(Id.).

On June 17, 2002, claimant again visited with Dr. Gillespie to request referral to a local

chiropractor, as he had been seeing one as well in Washington State.  (AR 157).  Dr. Gillespie made

the referral, but noted that a physical therapist had found claimant's condition to be "not that severe"

and that x-rays showed "some mild degenerative changes but otherwise his exam is not showing

4

1   anything serious." (Id.).

2       Claimant also was examined by various physicians in Washington State in connection with a

3   workers' compensation claim. (AR 186-226). On March 4, 2002, G. DeAndrea, M.D. (neurology),

4   Larry D. Iversen, M.D. (orthopedic surgery) and Richard Rivera, D.C. (chiropractic medicine) issued

5   a joint report after neurologic, orthopedic and chiropractic examinations. (AR 200-04). These

6   physicians found "no objective evidence on examination today of any orthopedic or neurologic

7   impairments, specifically myelopathy, radiculopathy, plexopathy, or neuropathy." (AR 204).

8   Specifically, the neurologic exam showed a normal gait, negative Romberg and 5/5 motor testing.

9   (AR 201). Sensory examination was found to be on-reproducible, non-dermatomal and unreliable.

10  (Id.) On orthopedic examination, there was a negative straight leg test in the sitting position, but the

11  same test in the supine position was positive (left groin pain). (AR 202). The orthopedic diagnoses

12  were cervical degenerative joint disease and degenerative disc disease, C5-6 and C6-7. (AR 204). In

13  addition, the physicians reported "evidence of pain behavior on examination." (Id.).

14      On June 28, 2003, claimant underwent a consultative orthopedic examination by Jonathan M.

15  Gurdin, M.D. (AR 249-51). Dr. Gurdin reported that claimant was talking only over-the-counter

16  medications such as Tylenol at the time, that he walked without a limp and that his left shoulder was

17  nontender to palpation. (AR 249-50). Dr. Gurdin also noted "questionably positive impingement

18  signs" at the left shoulder. (AR250). A lower back examination revealed slight tenderness in the

19  midline from L4 to the sacrum, as well as tightness in the left lumbar paraspinal area that improved

20  with back motion. (Id.). Straight leg raising was to 70 degrees on the right and to 50 degrees on the

21  left with low back pain, while seated straight leg raising reportedly caused slight pain. (Id.). Dr.

22  Gurdin's diagnoses were (1) lumbar myofascitis, (2) slight thoracolumbar curve, (3) cervical

23  myofascitis with degenerative disc disease and (4) possible impingement syndrome of the left

24  shoulder. (AR 251). He opined that claimant could probably lift 20 to 25 pounds occasionally and

25  10 pounds frequently, and further that he could sit and stand for 1 ½ to 2 hours at a time and for 5 to

26  6 hours in a workday. (AR 251).

27      On September 5, 2003, reviewing state agency physician Alfred Torre, M.D. prepared a synopsis

28  of the medical records to date and noted that "[t]he inconsistencies in this case are largely due to the

1  claimant's overstating his pain and his failure to cooperate completely with testing when he is

2  examined."  (AR 264).  Dr. Torre concluded that claimant's injury and degenerative changes could

3  reasonably be expected to cause some degree of pain, with stiffness and soreness that would preclude

4  heavy work.  (Id.).   However, Dr. Torre concluded that claimant could be expected to lift and carry

5  up to 50 pounds occasionally and 25 pounds frequently, with a restriction on overhead reaching with

6  his left arm but no other limitations.  (Id.).

7         On September 24, 2003, yet another report was prepared by reviewing state agency physician

8  Murray Mits, M.D. (AR 247-28).  Dr. Mits briefly reviewed claimant's medical history, noted

9  preexisting cervical DJD and degenerative disc disease at Cr-6 and C6-7, but no objective evidence

10  of any orthopedic or neurological impairment.  (AR 247).  In a residual functional capacity checklist,

11  Dr. Mits identified the same exertional capacity limitations as been noted on September 5, 2003 by

12  Dr. Torre.  (AR 242).

13         On February 17, 2004, claimant presented at the Porterville Health Clinic seeking to have a

14  disability form completed.  (AR 282).  He was examined by Chi Nguyen, M.D., who reported

15  negative results on a straight leg raising test.  (Id.).  Dr. Nguyen's objective finding was "[m]ild

16  tenderness on lumbosacral spine."  (Id.).

17         On June 4, 2004, a CT scan was taken of claimant's cervical, thoracic and lumbar spine.  (AR

18  304).  As reported by Frank Macaluso, M.D., the impressions from this scan were as follows: "Mild

19  degenerative narrowing at C5-6 disk interspace and moderate degenerative narrowing at C6-7 disk

20  interspace noted.  There is also mild degenerative narrowing of the L4-5 disk interspace.  The other

21  cervical, thoracic and lumbar disk interspace heights are well maintained.  Vertebral body heights are

22  well maintained.  No fractures or subluxation deformities are seen."  (Id.)

23         On June 19, 2004, Richard S. Marks, a physicians' assistant at the Porterville clinic,

24  completed a checklist medical source statement form in which he stated that claimant could lift 10

25  pounds occasionally and less than that on a frequent basis, and that he could stand and or walk for

26  2-4 hours in an 8-hour workday.  (AR 266-69).  According to physician's assistant Marks, these

27  limitations were due to claimant's "moderate cervical degenerative disc disease & spinal stenosis &

28  lumbar/thoracic osteoarthritis."  (AR 268).

1    **SEQUENTIAL EVALUATION PROCESS**

2    The Social Security Act defines "disability" as the "inability to engage in any substantial

3    gainful activity by reason of any medically determinable physical or mental impairment which can be

4    expected to result in death or which has lasted or can be expected to last for a continuous period of

5    not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act also provides

6    that a claimant shall be determined to be under a disability only if his impairments are of such

7    severity that claimant is not only unable to do his previous work but cannot, considering claimant's

8    age, education and work experiences, engage in any other substantial gainful work which exists in

9    the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

10    The Commissioner has established a five-step sequential evaluation process for determining

11    whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. Step one determines if he is engaged

12    in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b).

13    If he is not, the analysis proceeds to step two, which considers whether claimant has a medically

14    severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).

15    If claimant does not have a severe impairment or combination of impairments, the disability

16    claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which

17    compares claimant's impairment with a number of listed impairments acknowledged by the

18    Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d),

19    416.920(d); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of the listed

20    impairments, claimant is conclusively presumed to be disabled. If the impairment is not one

21    conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines

22    whether the impairment prevents claimant from performing work he has performed in the past. If

23    claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e),

24    416.920(e). If claimant cannot perform this work, the fifth and final step in the process determines

25    whether he is able to perform other work in the national economy in view of his age, education and

26    work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). See Bowen v. Yuckert, 482 U.S. 137

27    (1987).

28    *///*

7

1    The initial burden of proof rests upon a claimant to establish a *prima facie* case of entitlement

2 to disability benefits.  Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971).  In terms of the five

3 step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the

4 claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to

5 assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ

6 shares the burden at each step."  Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics

7 in original).  The initial burden is met once a claimant establishes that a physical or mental

8 impairment prevents him from engaging in his previous occupation.  The burden then shifts to the

9 Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2)

10 that a "significant number of jobs exist in the national economy" which claimant can perform.  Kail

11 v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

12                                    **STANDARD OF REVIEW**

13    Congress has provided a limited scope of judicial review of a Commissioner's decision.  See,

14 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when

15 the determination is not based on legal error and is supported by substantial evidence.  See Jones v.

16 Heckler, 760 F.2d 993, 995 (9th Cir. 1985); Sanchez v. Secretary of Health & Human Services, 812

17 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

18 contrary to treating physician's findings).  "The [Commissioner's] determination that a claimant is

19 not disabled will be upheld if the findings of fact are supported by substantial evidence."  Delgado v.

20 Heckler, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S.C. § 405(g)).  Substantial evidence is more

21 than a mere scintilla, Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less

22 than a preponderance.  McAllister v. Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v.

23 Secretary of Health and Human Services, 846 F.2d 573, 576 (9th Cir. 1988).  Substantial evidence

24 "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

25 Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted).  "[S]uch inferences and

26 conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld.

27 Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as

28 a whole, not just the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan,

1   877 F.2d 20, 22 (9th Cir. 1989) (quoting <u>Kornock v. Harris</u>, 648 F.2d 525, 526 (9th Cir. 1980)).

2       It is the role of the trier of fact, not this court, to resolve conflicts in evidence.  <u>Richardson</u>,

3   402 U.S. at 400.  If evidence supports more than one rational interpretation, the court must uphold

4   the decision of the ALJ.  <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if there is

5   substantial evidence to support the administrative findings, or if there is conflicting evidence that

6   will support a finding of either disability or nondisability, the finding of the Commissioner is

7   conclusive.  <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  Nevertheless, a decision

8   supported by substantial evidence will still be set aside if the proper legal standards were not applied

9   in weighing the evidence and making the decision.  <u>Brawner v. Secretary of Health and Human</u>

10  <u>Services</u>, 839 F.2d 432, 433 (9th Cir. 1987).

11                          **ALJ'S FINDINGS**

12      **Step One**

13      The ALJ found at step one that "claimant has not engaged in substantial gainful activity since

14  the alleged onset of disability."  (AR 22).

15      **Step Two**

16      At step two, the ALJ found that claimant suffered from degenerative disc disease of the

17  cervical and lumbar spine with neck and low back pain, combined with left shoulder impingement

18  syndrome, which he considered "severe."  (<u>Id</u>.)

19      **Step Three**

20      At step three, the ALJ assessed whether claimant's impairments, while severe, were among

21  those acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.

22  <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of

23  Impairments).  The ALJ  concluded that claimant's impairments did not meet or equal any of the

24  listed impairments.  (AR 22).

25      **Step Four**

26      At step four, ALJ Berry found that claimant could not reach overhead with his non-dominant

27  left upper extremity.  (AR 22).  The ALJ therefore found that claimant could not perform his past

28  relevant work as a farm laborer, which involved frequent overhead reaching with the upper

1    extremities.  (AR 21-22)

2        **Step Five**

3        At step five, the ALJ found that claimant had the residual functional capacity to perform a

4    significant range of medium work: lifting and carrying 25 pounds occasionally and up to 50 pounds

5    frequently, standing and/or walking for 6 hours in an 8-hour workday; and sitting for 6 hours in a

6    workday.  (AR 22-23).  With these limitations, and given claimant's age, education and work

7    experience, the ALJ noted that a finding of not-disabled was directed under "the Grids," 20 C.F.R.

8    Pt. 404, Subpt. P, App. 2, Rule 203.11.  (AR 23).  In addition, and using the Grids only as a

9    framework for decision-making, the ALJ found that there were a significant number of jobs in the

10   national economy that claimant could perform, including hand packer (12,000 positions in California

11   and 120,000 nationally), assembler (16,000 positions in California and 160,000 nationally) and

12   machine operator (12,000 positions in California and 120,000 nationally).  (AR 23).  The ALJ

13   therefore concluded that claimant was not disabled under the Act.  (Id.).

14                                    **<u>ISSUES</u>**

15       Claimant's Opening Brief raised the following issue for consideration:

16       1.  Whether the ALJ erred in discounting, in part, the report of consultative examiner

17   Jonathan M. Gurdin, M.D.

18       2.  Whether the ALJ erred in discounting the opinion of claimant's physician's assistant

19   Richard S. Marks.

20       3.  Whether the ALJ erred in failing to find claimant disabled under the Grids.

21       4.  Whether the ALJ, who posed several hypothetical questions to a vocational expert,

22   adopted the wrong (medium work capacity) hypothetical in his written determination.

23       5. Whether the ALJ erred in finding that claimant was not credible.

24       This Court must uphold the Commissioner's determination that claimant is not disabled if the

25   Commissioner applied the proper legal standards and there is substantial evidence in the record as a

26   whole to support the decision.

27   ///

28   ///

**DISCUSSION**

**1.      Whether the ALJ properly discounted the opinion of consultative examiner Jonathan M. Gurdin, M.D.**

Claimant asserts that ALJ Berry improperly discounted the residual functional capacity opinion of consultative examiner Jonathan Gurdin, M.D.  (Doc. 17, pp. 8-10) ("[t]he reason[] given by the ALJ in rejecting Dr. Gurdin's assessment is not supported by the record").  The Court agrees that ALJ Berry erred in the manner in which he dismissed Dr. Gurdin's opinion.

The courts distinguish among the opinions of three types of physicians:  treating physicians, physicians who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians").  Lester v. Chater, 81 F.3d 821, 839 (9th Cir. 1996).  As a general rule, a treating physician's opinion is given special weight because of his or her familiarity with a claimant's physical condition.  Id.; Fair v. Bowen, 885 F.2d 597, 604-05 (9th Cir. 1989); see also Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) ("Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians"); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, *1 (July 2, 1996) (the opinions of a treating physician ordinarily should be given great weight).

 Regardless of the weight given to a treating physician's medical opinion, it is not binding on the ALJ with respect to the ultimate determination of disability.  See Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194-95 (9th Cir. 2004) (treating physician had opined that claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R. § 404 Subpt. P, App. 1, § 105C); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)("treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability").

Accordingly, although entitled to great weight, a treating physician's opinion is not conclusive and may be rejected by the ALJ under appropriate circumstances.  Where a treating physician's opinion is not contradicted by another physician, it may be rejected by the ALJ only for "clear and convincing" reasons supported by substantial evidence in the record.  Reddick v. Chater,

1    157 F.3d 715, 725 (9th Cir. 1998) (quoting Lester, 81 F.3d at 830).  Where a treating physician's

2    opinion is contradicted by another physician, the ALJ may reject the treating physician's opinion

3    only by providing "'specific and legitimate reasons' supported by substantial evidence in the record

4    for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  The same test

5    applies to examining physicians: the ALJ must give clear and convincing reasons for rejecting

6    uncontradicted opinions, or "specific and legitimate reasons supported by substantial evidence in the

7    record" for rejecting those opinions that have been contradicted.  Lester, 81 F.3d at 830-31.

8          Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the

9    ALJ to reject a treating or examining physician's opinion.  The reasons include: conflicting medical

10   evidence, the absence of regular medical treatment during the alleged period of disability, and the

11   lack of medical support for physicians' reports that are based substantially on the claimant's

12   subjective complaints of pain.  Flaten v. Secretary of Health & Human Svcs., 44 F.3d at 1453, 1463-

13   64; Fair, 885 F.2d at 604.  The ALJ may also disregard a physician's opinion which is "brief and

14   conclusory in form with little in the way of clinical findings to support [its ] conclusion."

15   Magallanes, 881 F.32d at 751(quoting Young v. Heckler, 803 F.2d 962, 968 (9th Cir. 1986)).  In

16   contrast, vague, broad or generalized reasons are insufficient grounds for the ALJ to reject a treating

17   physician's opinion.  McAllister v. Sullivan, 888 F.2d 599, 692 (9th Cir. 1989).

18         Here, after examining claimant on June 28, 2003, Dr. Gurdin diagnosed (1) lumbar

19   myofascitis, (2) slight thoracolumbar curve, (3) cervical myofascitis with degenerative disc disease

20   and (4) possible impingement syndrome of the left shoulder.  (AR 18, 251).  In addition,

21   Dr. Gurdin's examination of claimant revealed a positive Waddell sign and straight leg raising to

22   70 degrees on the right and 50 degrees on the left with low back pain.  (AR 250).  With these

23   findings and diagnoses, Dr. Gurdin concluded that claimant could probably lift 20 to 25 pounds

24   occasionally and 10 or 15 pounds frequently.  (AR 251).  Upon reporting these findings, ALJ Berry

25   assigned "substantial evidentiary weight" to Dr. Gurdin's diagnoses, but not to his residual

26   functional capacity assessment:

27              The opinion of Dr. Gurdin, Consultative Examiner is assigned
                substantial evidentiary weight, except with his limitation to lifting 25
28              pounds.  (AR 20).

12

1    As noted above, ALJ Berry was obligated under the law to give "specific and legitimate

2  reasons [] supported by substantial evidence in the record" for rejecting the contradicted[2] opinion of

3  examining physician Gurdin.  Lester, 81 F.3d at 830-31.  Contrary to this legal obligation, he gave no

4  reason at all.  This was error.  See Reddick v. Chater, 157 F.3d at 725 (9th Cir. 1998) ("The ALJ

5  must do more than offer his conclusions"); Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)

6  ("To say that medical opinions are not supported by sufficient objective findings or are contrary to

7  the preponderant conclusions mandated by the objective findings does not achieve the level of

8  specificity our prior cases have required, even when the objective factors are listed seriatim.  The

9  ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain

10  why they, rather than the doctors', are correct").

11    In light of the foregoing, remand is required.  Barbato v. Commissioner of Social Security,

12  923 F. Supp. 1273, 1277-78 (C.D. Cal. 1996) (remand for additional administrative proceedings was

13  proper where adverse decision of ALJ failed to provide sufficient justification for disregarding

14  treating physician's opinion, particularly where "automatic reversal would bestow a benefits windfall

15  upon an undeserving, able claimant").

16  **2.    ALJ's Decision to Discount Opinion of Physician's Assistant Richard S. Marks**

17    Claimant also asserts that ALJ Berry improperly discounted the residual functional capacity

18  opinion of Richard S. Marks, a physician's assistant to Chi Nguyen, M.D.  (Doc. 17, pp. 10-13).

19  Mr. Marks had opined, on a form signed by him and by Dr. Nguyen, that claimant could lift and

20  carry 10 pounds occasionally, less than that frequently, and that he could only stand/walk for 2 to 4

21  hours in an 8 hour workday.  (AR 266).

22    Here, ALJ Berry rejected a report authored by physician's assistant Richard Marks, and

23  signed by Dr. Nguyen, for the following reasons:

24        Physicians Assistant Marks only recently examined the claimant and
        his opinion is contradicted by the examining physicians.  Furthermore,
25        his statement that there is spinal stenosis is false.  Therefore, his

26  ///

27    [2]   Contradicting Dr. Gurdin, two non-examining state agency physicians, Alfred Torre, M.D. and Murray Mits,
M.D., opined upon review of claimant's medical records that claimant could lift and carry 50 pounds occasionally and 25
28  pounds frequently.  (AR 242, 264).

1      opinion is rejected as internally inconsistent and unsupported by the
       clinical findings.  (AR 20) (emphasis added).

2

3          An apparent problem with ALJ's Berry's analysis is his proposition that the diagnosis of

4   spinal stenosis was false and unsupported by clinical findings.  The problem arises because of a CT

5   scan taken on June 4, 2004.  (AR 304).  That scan found "mild degenerative narrowing [of] CF-6

6   disk interspace and moderate degenerative narrowing of C6-7 disk interspace."  (Id.) (emphasis

7   added).  Furthermore, as claimant observed in his opening brief, "stenosis" is, at least by definition,

8   "narrowing."  (Doc. 17, p. 11).  As stated in the Merck Manual:

9           Lumbar spinal stenosis is narrowing of the lumbar spinal canal, which
            produces pressure on the sciatic nerve roots (or sometimes the cord)
10          before their exit from the foramina, causing positional back pain and
            symptoms of nerve root compression.

11  The Merck Manual at 328 (18th ed. 2006)(emphasis added).

12         The Commissioner, in her opposition to claimant's opening brief, did not address the findings

13  noted in claimant's June 4, 2004 CT scan, nor did she address the consequences of those findings.

14  (Doc. 21, pp. 9-10).  For example, diagnostically documented spinal stenosis, if it exists and

15  depending upon its degree, might bear upon the accuracy of Dr. Gurdin's residual functional capacity

16  opinion.  That opinion, as noted above, was dismissed by the ALJ without explanation.

17         Unfortunately, the record does not reflect - and the ALJ did not address - whether a "mild" to

18  "moderate" narrowing of disk interspace as noted in the June 4, 2004 CT scan is akin to actual

19  narrowing of the spinal canal with potential nerve impingement.  Without that evidence, remand is

20  required so that the record can be clarified and supplemented to include an assessment as to the

21  meaning and ramifications of the June 4, 2004 radiological findings.  See Barbato, 923 F. Supp. at

22  1277-78 (remand for additional administrative proceedings where adverse decision of ALJ failed to

23  provide sufficient justification for disregarding treating physician's opinion); cf. Connett v. Barnhart,

24  340 F.3d 871, 875 (9th Cir. 2003)(when there are "insufficient findings" as to whether testimony

25  should be credited as true, court may remand to the Commissioner for "further determinations")

26  **3.      Whether the ALJ properly failed to find claimant disabled under the Grids**

27         Claimant asserts that his residual functional capacity is limited to sedentary work and that the

28  ALJ erred in determining that he was capable of a higher, medium, exertional level.  (Doc. 17, p. 13).

14

1   Had the ALJ found a sedentary work capacity, according to claimant, he would have been deemed

2   disabled under the Grids.  (Id.).

3       **a.      Background Regarding Exertional Levels**

4       Under the Social Security Act, a "sedentary work" capacity anticipates, among other things,

5   the ability to lift no more than 10 pounds at a time.  20 C.F.R. §§ 404.1567(a); 416.967(a).  A "light

6   work" capacity anticipates, among other things, the ability to lift no more than 20 pounds

7   occasionally or 10 pounds frequently.  20 C.F.R. §§ 404.1567(b); 416.967(b).  A "medium work"

8   capacity applies to those able to lift 50 pounds occasionally, and up to 25 pounds frequently.  20

9   C.F.R. §§ 404.1567(c), 416.967(c).  Here, having determined that claimant could frequently lift and

10  carry 25 pounds, and occasionally 50 pounds, ALJ Berry concluded that claimant was capable of

11  medium work.  (AR 22-23).

12      **b.      Background Regarding the Grids**

13      The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2 (also known as

14  "the Grids") facilitate administrative decision-making by "reduc[ing] four factors - residual

15  functional capacity, age, education, and work experience - to binary, 'yes/no' conclusions; the grids

16  then mandate a bright-line finding of disability or nondisability based upon the combination of these

17  four factors."  Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988).  Beneficially, the Grids can

18  serve to "relieve the Secretary of the need to rely on vocational experts" in the course of the

19  disability determination.  Heckler v. Campbell, 460 U.S. 458, 461 (1983).  However, when the Grids

20  do not adequately take into account a claimant's abilities and limitations, they serve only as a

21  framework, in which case resort to a vocational expert is still required.  Thomas, 278 F.3d at 960

22  ("The Grids are used to determine whether substantial gainful work exists for the claimant with

23  respect to substantially uniform levels of impairment . . . .  When they do not adequately take into

24  account claimant's abilities and limitations, the Grids are to be used only as a framework, and a

25  vocational expert must be consulted").

26      In the instant case, ALJ Berry found that claimant had the exertional capacity to perform

27  "medium work," but not the full range of such work.  (AR 23).  Accordingly, the ALJ referenced the

28  Grids only as a framework and, as is required, went beyond the Grids by referencing and relying

15

1   upon vocational expert testimony in his disability determination.  As the ALJ wrote:

2       Although the claimant's nonexertional limitations do not allow him to perform the
        full range of medium work, using Medical-Vocational Rule 203.11 as a framework
3       for decision-making, there are a significant number of jobs in the national economy
        that he could perform.  Examples of such jobs include work as (1) hand packer of
4       which there are 12,000 jobs in California and 120,000 jobs in the U.S. economy, (2)
        assembler of which there are 16,000 jobs in California and 160,000 in the U.S.
5       economy and (3) machine operator of which there are 12,000 jobs in California and
        120,000 jobs in the U.S. economy.  (AR 23).

6       c.      Claimant's Argument

7           Claimant's argument on appeal is that ALJ Berry's very selection of a "medium work"

8   capacity was error (and so, therefore, was the Grid analysis that followed).  (Doc. 17, p. 13).

9   According to claimant, the error occurred because the ALJ "improperly rejected Dr. Gurdin's

10  assessment and improperly reject[ed] the opinion of the treating physician, Dr. Nguyen."  (Id.)[3]  As

11  noted above, the Court already has found that ALJ Berry failed to set forth specific and legitimate

12  reasons for discounting the exertional capacity opinion of consultative examiner Jonathan Gurdin,

13  M.D.  Also as noted above, the Court already has found that the ALJ did not address whether a

14  narrowing of disk interspace as noted in claimant's June 4, 2004 CT scan is reflective of spinal

15  stenosis and, if it is, the severity of such a condition.  These issues need to be addressed upon remand

16  before a proper Grid analysis can be performed.

17  **4.      Whether the ALJ used the wrong exertional capacity hypothetical**

18          Paralleling his argument regarding ALJ Berry's application of the Grids, claimant asserts that

19  the ALJ improperly rejected the opinions of Drs. Gurdin and Nguyen insofar as he adopted a

20  vocational expert opinion not based on their assessments.  (Doc. 17, p. 13).  Again, and as noted

21  above, the Court already has found that ALJ Berry failed to set forth specific and legitimate reasons

22  for discounting the exertional capacity opinion of consultative examiner Jonathan Gurdin, M.D., and

23  also that he did not address whether a narrowing of disk interspace as noted in claimant's June 4,

24  2004 CT scan is reflective of spinal stenosis (which, in turn, may or may not be significant).

25

26          [3]  As noted in the Statement of Facts, supra, consultative examiner Jonathan Gurdin, M.D. had opined on June
27  28, 2003, that claimant could lift 20 to 25 pounds occasionally and 10 pounds frequently.  (AR 251).  Dr. Nguyen, in
    turn, signed a report by his physician's assistant, Richard Marks, which stated that claimant could lift only 10 pounds
28  occasionally.  (AR 266-69).

1   Resolution of these issues on remand is necessary in order to determine whether the ALJ adopted the

2   correct exertional capacity hypothetical and vocational expert responses thereto.

3   **5.        Whether the ALJ correctly discounted claimant's credibility**

4           Claimant asserts that ALJ Berry erred in discounting his credibility and that the medical

5   evidence in fact gives credibility to claimant's testimony at the administrative hearing.  (Doc. 17, pp.

6   14-15).  The Court disagrees.

7           A two step analysis applies at the administrative level when considering a claimant's

8   subjective credibility.  Smolen v. Chater, 80 F.3d at 1281.  First, the claimant must produce objective

9   medical evidence of an impairment and show that the impairment could reasonably be expected to

10  produce some degree of symptom.  Id. at 1281-82.  If claimant satisfies this test - and if there is no

11  evidence of malingering - the ALJ can reject the claimant's testimony about the severity of his or her

12  symptoms "only by offering specific, clear and convincing reasons for doing so."  Id. at 1281.  Such

13  specificity is crucial so as to enable effective judicial review.  See Mersman v. Halter, 161 F. Supp.

14  2d 1078, 1086 (N.D. Cal. 2001)("The lack of specific, clear, and convincing reasons why Plaintiff's

15  testimony is not credible renders it impossible for [the] Court to determine whether the ALJ's

16  conclusion is supported by substantial evidence"); SSR 96-7p (the ALJ's decision "must be

17  sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the

18  adjudicator gave to the individual's statements and reasons for that weight").

19          Here, upon first setting forth a synopsis of claimant's visits with various physicians (AR

20  17-19), ALJ Berry noted several specific, clear and convincing reasons - largely supported by

21  substantial evidence in the record - for discounting claimant's subjective complaints, and the

22  supposed limitations that went with them.  Thus, in concluding that "claimant's allegations are not as

23  severe as he alleges" (AR 20), ALJ Berry noted the following:

24          a.        While there was evidence of degenerative disc disease of the cervical and lumbar

25  spine, "it is only *mild* to *moderate* in nature and severity."  (AR 20) (emphasis in original).  This

26  finding by ALJ Berry was well supported by substantial evidence in the record, particularly by the

27  objective, diagnostic tests that had been performed on claimant over time. A September 26, 2001

28  x-ray showed only mild to moderate degenerative changes indicative of early degenerative disc

1   disease.  (AR 180).  Again, almost a year later, a June, 2002, x-ray showed only "mild degenerative

2   changes" according to claimant's treating physician, Christopher Gillespie, M.D.  (AR 157).

3   Another two years later, in June 2004, a CT again showed only "mild" to "moderate" degenerative

4   narrowing.  (AR 304).  Finally, a straight leg raising test by Chi Nguyen, M.D. on February 17, 2004

5   was negative, causing Dr. Nguyen to report that claimant suffered only "[m]ild tenderness on

6   lumbosacral spine."  (AR 282).

7           b.      ALJ Berry correctly reported the findings of three physicians who examined claimant

8   in March, 2002, and who noted "pain behavior, suggesting exaggeration of [claimant's] symptoms.

9   (AR 20).  Likewise, the ALJ accurately reported the comments of claimant's physical therapist,

10  Don Uttenreither, who noted that claimant exhibited "inconsistencies," "active holding back," and

11  "move[d] more freely & with minimal restrictions when not being tested."  (AR 161).

12          c.      The ALJ correctly reported claimant's limited or non-existent use of pain medications

13  over time, such as when examined in March, 2002, and in June 2003.  (AR 20, 200, 249).

14          d.      The ALJ accurately reported the observations of claimant's various treating and

15  examining physicians with respect to claimant's normal gait (AR 20, 161, 201, 249-50), observations

16  which contrasted with claimant's self-imposed use of a cane to ambulate.  (AR 20, 37).

17          In light of the foregoing, the Court finds that ALJ Berry sufficiently articulated a number of

18  inconsistencies justifying his decision to discredit claimant's subjective complaints (and claimant's

19  corresponding view of his exertional capacity), and that the existence of these inconsistencies was

20  well supported by substantial evidence in the record.  See Light v. Social Sec. Admin., 119 F.3d 789,

21  792 (9th Cir. 1997)("the ALJ may consider [claimant's] reputation for truthfulness, inconsistencies

22  either in his testimony or between his testimony and his conduct, his daily activities, his work record,

23  and testimony from physicians and third parties concerning the nature, severity, and effect of the

24  symptoms of which he complains"); Brawner, 839 F.2d at 433 (upon giving "great weight to [the]

25  ALJ's credibility assessment," the court concluded that it was supported by substantial evidence).

26                                          **CONCLUSION**

27          The Court has the discretion to remand the case for additional evidence and finding or to

28  award benefits.  Smolen v. Chater, 80 F.3d at 1292 (9th Cir. 1996).  The Court may award benefits if

1    the record is fully developed and further administrative proceedings would serve no useful purpose.

2    Id.  Remand is appropriate when additional administrative proceedings could remedy defects.

3    Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).  In this case, further development of the

4    record is necessary for a proper determination to be made.

5        Accordingly, it IS ORDERED that

6        1.     Claimant's social security complaint IS GRANTED; and

7        2.     The matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for

8    development of the record and further consideration, consistent with this decision, of claimant's

9    status as disabled.  Specific and legitimate reasons should be given for the rejection of the opinions

10   of treating physicians and consultative examiners.  In doing so, consideration of the issues raised in

11   claimant's June 4, 2004 CT scan is required so that the Commissioner can assess whether claimant's

12   impairments are so severe as to preclude substantial gainful activity, 20 C.F.R. §§ 404.1520(d)(DIB),

13   416.920(d)(SSI); 20 C.F.R. § 404 Subpt. P App. 1; whether claimant is capable of performing work

14   he has performed in the past,  20 C.F.R. §§ 404.1520(f)(DIB), 416.920(f)(SSI); and, if required,

15   whether on the basis of claimant's age, education, work experience, and residual functional capacity,

16   claimant can perform any other gainful and substantial work within the economy, 20 C.F.R.

17   §§ 404.1520(g)(DIB), 416.920(g); and

18        3.     Judgment BE ENTERED for claimant Jose T. Benitez and against Defendant Jo Anne

19   B. Barnhart.

21   IT IS SO ORDERED.

22   Dated:   **August 1, 2006**                 **/s/ Theresa A. Goldner**

     **j6eb3d**                         UNITED STATES MAGISTRATE JUDGE